NATIONAL HOMES CORPORATION,
Appellee,

v.

LESTER INDUSTRIES, INC.,
Appellant.

NATIONAL HOMES CORPORATION,
Appellant,

v.

LESTER INDUSTRIES, INC., and Lawson L. Lester, Jr., Appellees.

Nos. 12456, 12457.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 11, 1968.

Decided Nov. 19, 1968.

Edwin B. Meade, Danville, Va. (Meade, Tate & Meade, Danville, Va., on brief) for National Homes Corp.

John W. Carter, Danville, Va. (Carter & Wilson, Danville, Va., on brief) for Lester Industries, Inc., and Lawson L. Lester, Jr.

Before SOBELOFF, WINTER and CRAVEN, Circuit Judges.

WINTER, Circuit Judge:

At the behest of National Homes Corporation ("National"), after an evidentiary hearing following the entry of a default judgment against Lester Industries, Inc. ("Lester Industries") and Lawson L. Lester, Jr. ("Lester"), the district court enjoined Lester Industries and Lester from competing with National by manufacturing, selling and delivering prefabricated housing units within the states of West Virginia and Maryland and within a portion of the State of Virginia. The injunction was based upon a

restrictive covenant given by Lester, a former employee of National. Lester Industries was a corporation formed by Lester promptly after he left the employ of National, and of which he was the president and principal stockholder. National appeals, asserting that the injunction should have extended to the entire State of Virginia, in which National, through its wholly-owned subsidiary, Lester Brothers, Inc. ("Lester Brothers") is engaged in the manufacture, sale and distribution of prefabricated housing units. Lester Industries and Lester appeal, asserting that no injunction should have issued for a variety of reasons, and that the injunction issued should not be extended to include the entire State of Virginia. We conclude that issuance of the injunction was proper, but that the injunction should extend to the entire State of Virginia, including those areas in which National does business through its wholly-owned subsidiary, Lester Brothers.

The facts are extensively stated in the memorandum decision of the district court. National Homes Corporation v. Lester Industries, Inc., 293 F.Supp. 1025 (W.D.Va.1968). Lester formed Lester Brothers in 1956 and the business prospered. In 1959, National, a large manufacturer of prefabricated housing units, concluded to expand its operations in the South, and it sought to purchase Lester Brothers. By an agreement, dated June 30, 1959, National contracted to purchase 80% of the stock of Lester Brothers in exchange for stock in National. National agreed to use its best efforts to have its stockholders elect Lester to the board of directors of National, and it agreed to employ Lester as the president of Lester Brothers at a salary of $50,000 per year for two years, to continue the employment of Victor Lester at a salary of $35,000 for two years, and not without the consent of Lester to cause the removal of five certain employees of Lester Brothers.

On July 17, pursuant to this agreement, National acquired 4,968 shares out of 5,000 shares of Lester Brothers outstanding. At the same time, Lester acquired from National a restricted stock option to purchase 4,634 shares of National Class "B" common stock at 85% of its then market value. National, describing itself as the owner of 80% of the capital stock of Lester Brothers, and stating that it acted on its own behalf and in behalf of Lester Brothers, simultaneously entered into an employment contract with Lester. By the terms of the contract, Lester was employed for ten years at a salary of $50,000 per year during the first two years of employment, and a minimum salary of $35,000 per year during the remaining eight years of said employment. In Paragraph 4 was contained the restrictive covenant, the text of which is set forth in the margin.[1] Subsequently, on April 23, 1960, National acquired the remaining 32 shares of Lester Brothers thus making the latter a wholly-owned subsidiary.

From July 17, 1959, and particularly from April 23, 1960, National exercised an increasing degree of operating control over Lester Brothers. By 1965, conflicts between Lester and National over the operation of Lester Brothers became marked and, on April 1, 1965, Lester resigned as president of Lester Brothers, and the parties executed a document con-

[1] "4. Anything herein to the contrary notwithstanding, it is agreed between the parties that at the end of the first two (2) years of employment, this agreement can be terminated by mutual agreement of the parties. In the event of such termination or if the contract is mutually terminated at any other time during said ten (10) year period, then it is agreed by Lawson L. Lester, Jr., that during the period ending ten (10) years from the date hereof, *he will not engage directly or indirectly, anywhere in the United States, in any enterprise in competition with the business of National Homes Corporation;* namely, the business of manufacture, sale and distribution of prefabricated housing units, *nor will he have any financial interest nor be employed in any such competing enterprise.*" (emphasis supplied).

stituting a mutual cancellation of the employment agreement of July 17, 1959.

Lester thereafter did not remain inactive. On July 6, 1965, under his aegis, Lester Industries was incorporated, and it promptly proceeded to engage in the business of manufacturing, selling and erecting prefabricated housing units. Since February 1966, Lester Industries has carried on business in close collaboration with Royal Homes, Inc., a corporation of which Lester Industries owns 50% of the stock. Lester, individually, has communicated with builder-dealer representatives of Lester Brothers, endeavoring to procure their business. Numerous employees of Lester Brothers have been engaged as employees of Lester Industries.

■■■ A default judgment was entered for the failure of Lester Industries and Lester to comply with discovery orders of the district court. While National contends on appeal that the district court was not thereafter required to take evidence to determine if injunctive relief should be granted and, if so, the scope of such relief, we need not decide this question. We conclude that the evidence amply supports the finding that there was competition between Lester, acting through Lester Industries, and National in the areas in which the injunction was granted, and that such competition was in violation of the restrictive covenant, itself supported by consideration and valid under the law of Virginia,[2] all as set forth in the memorandum decision of the district court. Clearly, National was entitled to injunctive relief, at least to the extent that it was granted by the district court.

■■ The district judge, however, excluded from the scope of his injunctive decree fifteen of Virginia's ninety-eight counties, apparently on the theory that National's "sphere of influence" did not extend to this area. Why this is so is not developed in the district court's memorandum decision. The fifteen counties in question form a continuous belt in southwestern and south central Virginia, varying considerably in width, adjacent to the North Carolina border. We do not believe that the exclusion of these counties adequately represents the competitive posture of National in the State of Virginia. Certainly, a state line may constitute an accurate demarcation line for the purpose of delineating competitive spheres of influence. Corporations frequently engage in no activity whatever in particular states, among other reasons, because of business qualification and tax laws. Impediments such as these have no application, of course, to activities from county to county within a single state. Furthermore, geographical factors may produce a situation in which a corporation conducts its business only in a sharply defined portion of a state. Finally, a corporation may have historically limited its activities to a given section of a state, for example, a large metropolitan area. However, none of these factors, which would have clearly limited National's competitive thrust to a well-defined area, is present in the instant case with respect to the question of the territorial scope of the injunctive relief within the State of Virginia. To the contrary, the record shows that National, acting in its own corporate capacity, is a substantial competitive factor in terms of past sales in various widely-scattered sections of Virginia, and thus must be considered a significant competitive force throughout the State of Virginia. In view of the obvious breadth of the restrictive covenant,[3] we are constrained to conclude that an unduly narrow rendering of the competitive sphere of influence

---

2. Worrie v. Boze, 191 Va. 916, 62 S.E.2d 876 (1951); Meissel v. Finley, 198 Va. 577, 95 S.E.2d 186 (1956).

3. The restrictive covenant prohibited Lester from engaging "directly or indirectly, *anywhere in the United States*, in any enterprise in competition with the business of National Homes Corporation." We decline, as did the district court, to pass upon the effect of the covenant, if any, if Lester should commence business operations in a state in which National or its subsidiaries are not doing business.

of National is not consistent with the intention of the parties.

There are other reasons why National should have been granted injunctive relief in those areas of Virginia in which relief was denied. It is true that in the excluded counties National, in its own name, had done little or no business in the manufacture, sale and erection of prefabricated housing units, but it is equally true that in those areas Lester Brothers was actively engaged in such business. In regard to the business done by Lester Brothers, the district court denied relief because it was of the view that it lacked the power to pierce the corporate veil of National so as to protect National's wholly-owned subsidiary from violation of the restrictive covenant when the subsidiary was not a party to the document in which the covenant was created.[4]

Although in this appeal Lester Industries argues that to afford such relief there must be an unwarranted disregard of National's corporate entity, and National argues that such disregard is legally supportable, we view the issue in simpler terms. To us the question presented is one of interpretation of the restrictive covenant and, specifically, what is the "business of National Homes Corporation" within the meaning of Paragraph 4 of the July 17, 1959, employment agreement. Viewing the context in which the agreement was executed and the covenant given, we conclude that the business of National was not only that which it theretofore and thereafter conducted in its own name, but also the business that National was about to undertake in the name of Lester Brothers, which it was acquiring for that purpose.

The record makes clear that National did not acquire the stock of Lester Brothers simply as an investment. It acquired substantially all (and later all) of the stock of Lester Brothers to constitute Lester Brothers an operating subsidiary of National and thus to expand the business of National into the geographical area in which Lester Brothers was active. Admittedly, there would be some purpose in National's obtaining a restrictive covenant from Lester to protect National in the areas in which it had theretofore carried on its business, since Lester was about to become a director of National and, presumably, would have access to important records of National, setting forth the method in which it did business and its customer lists and other confidential information. But it is more reasonable to conclude that National also sought protection of the Virginia business which it was about to undertake through Lester Brothers, especially since Lester was to continue to be the principal operating head of Lester Brothers and was to have the opportunity to strengthen his goodwill in the area in which he was already known and had been successful.

Accordingly, we affirm the injunctive relief which was granted, but vacate that portion of the decree which denied National injunctive relief in all of Virginia, and direct the entry of a decree granting such relief. The district court may thereafter proceed to determine what monetary damages were sustained by National as a result of violation of the restrictive covenant as we have interpreted it.

Affirmed in part and reversed in part.

---

4. Lester Brothers is not a party to the litigation. Apparently Lester Brothers was not joined as a plaintiff because to do so would destroy diversity jurisdiction. In denying National Homes injunctive relief in the geographical areas in which Lester Brothers did business, the district court specified that the denial was without prejudice to National's right to institute proceedings in a state court with Lester Brothers as a party to the litigation.

We call attention to the fact, however, that National, in executing the document which contained the restrictive covenant, described itself as acting on its own behalf *and on behalf of Lester Brothers.*