# CIRCUIT COURT OF THE CITY OF NORFOLK

Innovative Systems
and Solutions, Inc.

v.

William Alex Hannah,
David Cantwell,
and Patrick Tredway

July 31, 2008

Case No. (Civil) CL07-6926

BY JUDGE CHARLES E. POSTON

This action is before the Court upon the Defendant's demurrer. Having considered the written submissions of the parties and the argument of counsel, the Court sustains the demurrer and dismisses as to Counts I, II, III, IV, VI, VIII, X, XII, XVIII, and XIX. The demurrer is overruled as to the remaining counts.

*Background*

Consistent with familiar principles, the facts will be reviewed in the light most favorable to the Plaintiff. The Plaintiff, Innovative Systems & Solutions, Inc., d/b/a American Business Systems, Inc. ("ABS"), is a Cisco certified Gold Partner that sells, installs, and services network-based Internet Protocol ("IP") communications. (First Am. Comp., ¶ 1.) In 2004, ABS hired the Defendants, William Alex Hannah, David Cantwell, and Patrick Tredway,

as network and voice engineers. (First Am. Comp., ¶ 2.) While employed with ABS, Hannah took four out of the five examinations necessary to become a Cisco Certified Voice Professional ("CCVP"), whereas Tredway and Cantwell became Internetwork Engineers, the highest level of Cisco certification. (First Am. Comp., ¶ 2.) ABS claims that it paid the expenses for them to acquire these certifications.

Each Defendant signed an Individual Employment Agreement ("Employment Agreement"), agreeing not to compete with ABS for one year following termination of employment with the company. (First Am. Comp., ¶ 3.) The Employment Agreement restricts the employees' actions within a Restricted Area, defined as "the geographic region within a ninety (90) mile radius of any ABS or any established site from which ABS provides support services for clients." (First Am. Comp., ¶ 22.) This includes Richmond, Roanoke, and Norfolk. (First Am. Comp., ¶ 22.) The Non-Competition clause states:

> (b) Within the Restricted Area . . . I will not solicit work or employment from, commence employment with, or provide or sell services or products to, or perform duties for or on behalf of any Competitor . . . where the work performed by me includes Prohibited Activities.
>
> (c) Within the Restricted Area, I will not undertake the planning of, organize, or assist in the organization or formation of, or operate or promote any competitor. . . .
>
> "*Competitor*" means any enterprise . . . that derives, or plans to derive, revenue from the same or substantially similar lines of business as are conducted at ABS. . . .
>
> "*Prohibited Activities*" means work duties which are the same as, substantially similar to, or directly related to the job duties or functions which I performed for ABS . . . or involves work or services on or related to products, systems, and/or services competitive with the products, systems, and/or services manufactured, sold, leased, serviced, or provided by ABS. . . .

(First Am. Comp. Ex. A, B, and "C," ¶ 4(b)–(c).)

Cantwell and Tredway terminated their employment with ABS in March 2007 and started TBL Networks, Inc. ("TBL"), which is a competitor of ABS. (First Am. Comp., ¶ 30.) (Alan Sears is the third partner at TBL; however, he was not a former ABS Employee.) To avoid "an obvious and impending lawsuit," Plaintiff claims that Tredway and Cantwell, agreed to

modify their Employment Agreements ("Modified Agreement"). (First Am. Comp., ¶ 4.) Under the terms of this Modified Agreement, ABS continued to employ Tredway and Cantwell as contract employees "for four months or until ABS was able to achieve its Cisco Gold Partner Certification." (First Am. Comp., ¶ 37.) The Non-Competition and Non-Solicitation clauses in the Modified Agreements states:

> For a period of one (1) year beginning from the date of the final invoice to an ABS customer or prospect for work performed by Employee or [TBL], Employee agrees not to solicit business from or sell services or products to such customer or prospect, either directly or indirectly. "ABS Customer" means any of ABS' current customers and any other Person to which during the twelve (12) month period measured backward from the date of Employee's termination . . . such terms includes Persons which are ABS customers as of the date of the termination and Persons which become ABS customers thereafter. "ABS Prospects" means any of ABS' prospects and any other Person to which ABS or any of its Affiliates have attempted, targeted, or marketed its products and/or provision of services at any time during the twelve (12) month period measured backward from the date of Employee's termination . . . such terms include Persons which are ABS Prospects at the date of Employee's termination and Persons which become ABS Prospects thereafter.

(First Am. Comp. Ex. E and F, ¶ (B)(1)(c).) This provision modifies ¶¶ 4(a), (b), and (c) in the Employee Agreements. The Modified Agreement also states that, if Cantwell and Tredway violate its terms, their original Employment Agreement would be reinstated. (First Am. Comp. Ex. "E" and "F," ¶ (C)(1).) Additionally, the original Employment Agreements remained in full effect except as modified. (First Am. Comp. Ex. E and F, ¶ (C).)

TBL also entered into a separate agreement with ABS ("TBL Agreement"). The Non-Competition clause in the TBL Agreement states:

> [TBL] agrees not to solicit business from or sell services or products, or perform duties for or on behalf of to [sic] any ABS Client or Prospect where the business, products, or services are competitive with those of ABS, any ABS Client or Prospect for a period of one (1) year from March 30, 2007. . . .

(First Am. Comp. Ex. D at p. 4, ¶ D.) The Non-Solicitation clause states:

> [TBL] agrees not to solicit or hire, directly or indirectly, any ABS employee while this Agreement is in effect. [TBL] also agrees not to solicit, directly or indirectly, any ABS Customer or Prospect while this Agreement is in effect. In addition, [TBL] agrees not to solicit any ABS Customer or Prospect with whom they have performed work on behalf of ABS for one (1) year from the date of the final invoice to the Customer or Prospect for work performed by [TBL].

(First Am. Comp. Ex. D at p. 4, ¶ C.)

ABS alleges that "Cantwell provided services to and sold Cisco products to the Martin Agency, an ABS customer, within the one year prohibited time period." (First Am. Comp., ¶ 43.) According to the Complaint, Tredway and Cantwell also solicited and/or provided services to the Bank of Virginia, an ABS prospect. (First Am. Comp., ¶ 44.) ABS claims that TBL was able to achieve "a certain level of partnership with Cisco," thereby enabling it to compete with ABS. (First Am. Comp., ¶ 45.) This was achieved when Hannah, who had previously terminated his employment with ABS, registered his CCVP credentials with TBL. (First Am. Comp., ¶ 46.) Although the Complaint also acknowledges that Hannah did not actually do any work for TBL (First Am. Comp., ¶ 46), ABS claims that this allowed TBL to "fraudulently obtain the 'Premier Partner' status and achieve the Advanced Unified Communication Specialization with Cisco." (First Am. Comp., ¶ 46.) ABS alleges that, by registering with TBL, Hannah violated his Employment Agreement. ABS also claims that Hannah promoted TBL by developing its website. (First Am. Comp., ¶ 48.)

Finally, ABS claims that Tredway and Cantwell have failed to repay their training expenses. In their Employee Handbook, Tredway and Cantwell agreed to reimburse ABS for their Training expenses if they left ABS within one year of certification. (First Am. Comp., ¶ 49.) When Tredway and Cantwell refused to reimburse the training costs, ABS deducted $3,976.68 from the amount owed TBL for work that Tredway and Cantwell performed pursuant to the TBL Agreement. (First Am. Comp., ¶ 50.) ABS claims that TBL is still invoicing ABS for the deducted amount, including late fees and interest. (First Am. Comp., ¶ 51.) ABS claims that Cantwell still owes an additional $2,583.18 for attending a Cisco Networkers Conference in the summer of 2006.

ABS now brings this action against the Defendants alleging Breach of Contract, Tortious Interference with Contractual Relations, Tortious Interference with Business Expectancy, and Statutory and Common Law Conspiracy. ABS is also asking for a Declaratory Judgment to provide an interpretation of the Employee Handbook and Tredway's and Cantwell's Modified Agreements.

*Legal Standard*

A demurrer alleges "that a pleading does not state a cause of action or . . . fails to state facts upon which the relief demanded can be granted." Va. Code § 8.01-273 (2008). In ruling on a demurrer, the "trial court is required to consider as true all material facts that are properly pleaded, facts which are impliedly alleged, and facts which may be fairly and justly inferred from the facts alleged." *Luckett v. Jennings*, 246 Va. 303, 307, 435 S.E.2d 400, 403 (1993). The filing of a demurrer, however, "does not admit the correctness of the pleader's conclusions of law." *Fox v. Custis*, 236 Va. 69, 71, 373 S.E.2d 373, 374 (1988). "A demurrer will be sustained when the pleading it challenges lacks 'sufficient definiteness to enable the court to find the existence of a legal basis for its judgment'." *Mark Five Construction, Inc. v. Castle Contractors*, 274 Va. 283, 287-88, 645 S.E.2d 475, 477 (2007) (*quoting Hubbard v. Dresser, Inc.*, 271 Va. 117, 122, 624 S.E.2d 1, 4 (2006)).

*Analysis*

I. *Count I: Breach of Contract against Cantwell*

Count I of the First Amended Complaint alleges that Cantwell is required to reimburse $2,583.13 to ABS for training expenses pursuant to the Employee Handbook. The Employee Handbook contains a Reimbursement Agreement, signed by Cantwell, which states that he must reimburse ABS for training expenses if he terminates employment less than one year after those expenses are incurred. (Mot. Craving Oyer App. A at p. 19.) However, the Employee Acknowledgement Form states that the Handbook "is a summary of information and policies and is not a contract of employment." (Mot. at p. 20.)

On Demurrer, Defendants argue that the Employee Handbook "is insufficient to create a contractual obligation." (Dem. 1.) Alternatively, even if the Employee Handbook does create contractual obligations, Defendants argue that it was modified by subsequent agreements and actions of the

parties. Finally, Defendants claim that Cantwell continued to work for ABS until July 15, 2007, which is more than one year after the June 19-23, 2006, training.

In *Progress Printing Co. v. Nichols*, 244 Va. 337, 341, 421 S.E.2d 428, 430 (1992), the Supreme Court of Virginia held that Virginia has not adopted a rule stating that employees may be bound by clauses in Employee Handbooks. The Court did not, however, explicitly hold that Employee Handbooks could *never* be considered contracts. Instead, the Court held that conflicting language in a second document superseded the conflicting provisions in the Employee Handbook. The Court did not decide whether the Employee Handbook in question actually satisfied the Statute of Frauds. See *Progress Printing*, 244 Va. at 341, 421 S.E.2d at 430.

The last page of the Employee Handbook, signed by the Defendants, contains this sentence: "I acknowledge that this handbook is a summary of information and policies and is not a contract of employment." (Mot. Craving Oyer App. A at 20.) The Reimbursement Agreement within the Employee Handbook also states, "Nothing herein is to be construed as or give rise to an employment contract. Any such contract will be entered into with [ABS] by separate agreement." (Mot. at p. 19.) This language is plain, clear, and unambiguous. Apart from the Employee Handbook, there is no "separate agreement" obligating the Defendants to reimburse ABS for their training expenses. The Reimbursement Agreement contained in the Employee Handbook does not create a contractual obligation by its own terms. Accordingly, the Court will sustain the Defendants Demurrer to Count I of the Amended Complaint and dismiss Count I.

## II. *Counts II–IV: Breach of Contract*

For the purposes of this Demurrer, the Court will view the TBL Agreement as it views the Modified Agreements. It is clear that the parties intended the TBL Agreement to be a restraint on trade to avoid litigation. *See Miran v. Merullo*, 2008 Va. Cir. LEXIS 37, at *5 (Virginia Beach, 2008) (Canada, J.) (holding that a provision in a contract between the parties was a covenant not to compete because "the parties clearly intended the clause to prevent the defendants from opening a competing business."

## A. *Enforceability of Covenants*

Generally, "covenants in restraint of trade are not favored, will be strictly construed, and in the event of an ambiguity, will be construed in favor of the employee." *Modern Environments, Inc. v. Stinnett*, 263 Va. 491, 493, 561 S.E.2d 694, 695 (2002) (*citing Richardson v. Paxton Co.*, 203 Va. 690, 795, 127 S.E.2d 113, 117 (1962)). When deciding whether to enforce a covenant not compete in an employment contract, the courts must consider:

> (1) Is the restraint, from the standpoint of the employer, reasonable in the sense that it is no greater than necessary to protect the employer's legitimate business interests?
> (2) From the standpoint of the employee, is the restraint reasonable in the sense that it is not unduly harsh and oppressive in curtailing his legitimate efforts to earn a livelihood?
> (3) Is the restraint reasonable from the standpoint of sound public policy?

*Simmons v. Miller*, 261 Va. 561, 580-81, 544 S.E.2d 666, 678 (2001).

Each case "must be decided on its own facts." *Modern Environments*, 263 Va. at 493, 561 S.E.2d at 695. The court must consider, as a whole, the function, geographic scope, and duration of the covenants. *Simmons*, 261 Va. at 581, 544 S.E.2d at 678. Additionally, in determining whether a restrictive provision is "unreasonably harsh and oppressive," the courts should consider "the parties involved, their respective positions, and the circumstances of the transaction." *Foti v. Cook*, 220 Va. 800, 806, 263 S.E.2d 430, 433 (1980). Finally, covenants are only upheld "when employees are prohibited from competing directly with the former employer or through employment with a direct competitor." *Omniplex World Services Corp. v. United States Investigations Services, Inc.*, 270 Va. 246, 249, 618 S.E.2d 340, 342 (2005).

In *Modern Environments*, the employer argued that the non-compete agreement was valid because it contained language "identical or similar to" other employment agreements enforced by the courts. 263 Va. at 494, 561 S.E.2d at 695. The Court ruled that, in addition to considering the facial validity of the covenants, the courts should also examine:

> the legitimate, protectable interests of the employer, the nature of the former and subsequent employment of the employee, whether the actions of the employee actually violated the terms of the non-compete agreements, and the nature of the restraint in light of all the circumstances of the case.

*Id.* at 494-95, 561 S.E.2d at 696. In other words, the employer must provide evidence that the restrictive covenant is facially reasonable and, that it is "reasonable and no greater than necessary to protect a legitimate business interest." *Id.* at 495, 561 S.E.2d at 696.

Defendants assert that the terms of the restrictive covenants in the Modified Agreements and the TBL Agreement are "unreasonable and unenforceable restraints of trade; the terms are overly broad as to geographic scope and as to the breadth of the activities restricted." (Defs.' Mem. 5, 10.) Additionally, they claim that the restrictive covenant includes "overly broad and ambiguous definitions of 'ABS Customer' and 'ABS Prospect'." (Defs.' Mem. 5, 10.)

## B. *Geographic Limitation*

The agreements do not contain a specific geographic limitation.[2] Defendants cite numerous cases holding that restrictive covenants without "expressed geographic limitations" are prohibited because they "could presumably be worldwide." (Defs.' Mem. 5.) *See generally, Alston Studios, Inc. v. Lloyd V. Gress & Assocs.*, 492 F.2d 279, 283, 1974 U.S. App. LEXIS 9852, at *8-9 (4th Cir. 1974); *Cantol v. McDaniel*, 569 F. Supp. 54, 57-58; 1983 U.S. Dist. LEXIS 14422, at *10-11 (E.D. Va. 2006); *Roto Die Co. v. Lesser*, 899 F. Supp. 1515, 1521, 1995 U.S. Dist. LEXIS 14806, at *16-17 (W.D. Va. 1995); *Power Distribution, Inc. v. Emergency Power Engineering, Inc.*, 569 F. Supp. 54, 57, 1983 U.S. Dist. LEXIS 19422, at *9-10 (E.D. Va. 1983); *Totten v. Employer Benefits Management, Inc.*, 60 Va. Cir. 342, 344, 2002 Va. Cir. LEXIS 401, at *5 (Roanoke 2002); *Pais v. Automation Products*, 36 Va. Cir. 230, 238, 1995 Va. Cir. LEXIS 1193, at *17-18 (Newport News 1995).

Plaintiff argues that the restriction is actually "*far less* restrictive on Defendants . . . because the Defendants were only prohibited from doing business with actual ABS customers/clients or prospects for one year not the population in general." (Pl.'s Mem. 9) (emphasis in original). In other words, "Defendants were free to compete with ABS and solicit customers *within any*

---

[2] There are geographic limitations in other provisions of the Agreements. *See* Complaint, Exhibit "D," p. 3, ¶ A; Exhibits "E" and "F," p. 2, ¶ 1(a). However, these provisions are not at issue on Demurrer.

*geographic area* as long as they were not soliciting a current customer, client, or prospect of ABS as defined by the TBL Agreement." (Pl.'s Mem. 9) (emphasis in original).

The Court finds that the lack of a geographic limitation is *per se* unreasonable. The courts almost unanimously require that restrictive covenants contain some type of geographic limitation. As written, the provisions can be read as either a "worldwide" limitation as argued by the Defendants, or they can be read as a "far less" restrictive limitation as argued by the Plaintiff. *See generally, Power Distribution,* 569 F. Supp. at 57-58, 1983 U.S. Dist. LEXIS at *10-11 ("The mere act of subjecting the employee to such uncertainty offends "sound public policy. . . .").

Accordingly, the Court holds that Tredway and Cantwell's Modified Agreements and the TBS Agreement are unenforceable restraints on trade. Therefore, the Court will sustain the Defendants' Demurrers to Counts II, III, and IV and dismiss those counts.

## C. *Restraint on Trade*

Defendants also claim that the terms of the agreements are ambiguous and overly-broad. For example, "ABS Client" is never defined in the agreement. Instead, "ABS Customer" is defined, and that term includes not only current ABS customers, but also "[P]ersons who become ABS customers thereafter." (First Am. Comp. Ex. D at 2, ¶ 3.) "ABS Prospects" is also broad, they say, because it includes "ABS prospects and any other Person to which ABS or any of its Affiliates have attempted, targeted, or marketed . . . at any time during the twelve (12) month period from the date of execution of this agreement. . . ." (First Am. Comp. Ex. D at 2, ¶ 4.) During oral argument, Plaintiff claims that, at the time the Agreement was drafted, the parties were all aware of who ABS's customers and Prospects were. Similar definitions are provided in Tredway's and Cantwell's Modified Agreements. (First Am. Comp. Ex. E and F, ¶ (B)(1)(c).) Finally, the Defendants claim that the agreements prohibit them from "selling services or products, and from performing duties . . . where the business, products, or services are not only competitive with those of ABS, but also competitive with those of 'any ABS Client or Prospect.'. . ." (Defs.' Mem. 7.)

ABS asserts that this issue should not be decided on Demurrer because the Plaintiff is entitled to offer evidence to show that the restrictions are reasonable. Furthermore, ABS argues that equitable principles should apply because "ABS tried to work with the Defendant Employees." (Pl.'s Mem. 7.)

In *Studio Center Corp. v. Ferraro*, 72 Va. Cir. 518, 521, 2007 Va. Cir. LEXIS 13, at *6 (Norfolk 2007) (Tripp, J.), the court held that "while the enforceability of a particular restrictive covenant is a question of law . . . the application of the law depends heavily on the facts and circumstances of a particular business arrangement." (internal citation omitted). *See also, Johns Bros. Security, Inc. v. Jennings*, No. CH01-1842, p. 1 (Norfolk Cir. Ct., June 5, 2002) (Leafe, J.) ("Whether or not the non-compete provisions contained in the employment contracts are over-broad and contrary to public policy is not an issue for this Court to decide on demurrer.") (Pl.'s Mem. Ex. A.) However, "a court may fairly sustain a demurrer if the covenant alleged to have been breached is facially invalid."*Studio Center*, 72 Va. Cir. at 521. (citation omitted).

The Court finds that the restraint on trade provisions in the Modified Agreements and the TBL Agreement are facially invalid. The word "prospects" can include any person or entity that might, at any time in the future, come to the Plaintiff's attention. This restriction on "prospect" is obviously open-ended and overly broad. It is by its clear and unambiguous meaning an unreasonable restraint on trade. Accordingly, the Court sustains the Defendants' Demurrers to Counts II, III, and IV due to a lack of geographic limitation and because of the unreasonable restraint on trade.

### III. *Count V: Breach of Contract Against Hannah*

The parties have submitted numerous correspondence on this issue. However, on Demurrer, the Court must rely on the pleadings.

In support of their demurrer to Count V, the Defendants say that the Plaintiff's allegation that Hannah breached his Employee Agreement by registering his CCVP certification with TBL does not, on its face, amount to a breach of his agreement. (Defs.' Mem. 11.) They further argue that ABS has acknowledged that Hannah did not perform any work for TBL. Furthermore, according to the Defendants, Hannah engaged in no "Prohibited Activities" because Hannah has worked at CarMax since leaving ABS. They argue that Hannah "was not performing, and ABS does not contend that he was performing, *any* work for TBL that was similar nature [sic] to his former work at ABS." (Defs. Mem. 12) (emphasis in original). Finally, Defendants claim that the restrictive covenants in the Employment Agreement are unreasonable and unenforceable restraints on trade; the terms are overly broad as to geographic scope and as to the breadth of activities restricted. Specifically, they argue that the definitions of "Competitor" and "Prohibited Activities" are too broad.

ABS responds that it has alleged sufficient facts to overcome the demurrer to Count V. The Amended Complaint, itself, alleges that Hannah registered his Cicso certification with TBL, allowing it to achieve "Premier Partner" status. Further, it asserts that Hannah's assisting in the development of TBL's website was a prohibited activity. (First Am. Comp., ¶¶ 46, 48.) ABS argues that it should have the opportunity to present evidence concerning the enforceability of the non-competition and non-solicitation provisions in Hannah's Employment Agreement.

The Court will overrule the Defendants' Demurrer to Count V. The restrictive covenant is facially valid, and it is not overly broad or unreasonable. The terms "Competitor" and "Prohibited Activities" are not overly broad, as they prohibit Hannah's involvement with ABS' competitors and restrict Hannah from engaging in the same or substantially similar work. Restrictive covenants are generally upheld "when employees are prohibited from competing directly with the former employer or through employment with a direct competitor." *Omniplex*, 270 Va. at 249, 618 S.E.2d at 342. Finally, the issue of whether Hannah's alleged conduct violated the Employee Agreement is a factual issue to be resolved at trial.

IV. *Counts VI–XII: Tortious Interference with Contractual Relations*

ABS alleges that the Defendants tortiously interfered with the respective agreements between ABS and TBL, and ABS and its former employees. Defendants argue that those agreements are unenforceable as a matter of law and argue further that counts VI-XII "are essentially reassertions of Plaintiff's contract claims." "[W]hen a plaintiff alleges and proves nothing more than disappointed economic expectations assumed only by agreement, the law of contracts, not the law of torts, provides the remedy for such economic loss." *Filak v. George*, 267 Va. 612, 618, 594 S.E. 610, 613 (2004). Defendants also rely on the intra-corporate immunity doctrine to assert that "an agent cannot tortiously interfere with his principal's contract . . . nor may a corporation's officer acting within the scope of his agency interfere with the corporation's own contract." *See generally Calkins v. Pacel Corp.*, 2007 U.S. Dist. LEXIS 57380, at *4 (W.D. Va. 2007); *Michigan Mut. Ins. Co. v. Smoot*, 128 F. Supp. 2d 917, 925 (E.D. Va. 2000); *Fox v. Deese*, 234 Va. 412, 427, 362 S.E.2d 699, 708 (1987).

The Court sustains the Demurrer to Counts VI, VIII, and X because the Court finds that the Modified Agreements and the TBL Agreement are facially invalid and, therefore, unenforceable. The Demurrer to Counts VII, IX, and XI is overruled because ABS has alleged sufficient facts to support this cause of

action against the Defendants based on Hannah's Employment Agreement. ABS has alleged and provided specific details to support its allegation that the Defendants tortiously interfered with the agreements at issue. *See Duggin v. Adams*, 234 Va. 221, 226-27, 360 S.E.2d 832, 835 (1987) (holding that the plaintiff must allege that the tortfeasor intentionally interfered with the contract by the use of improper methods, which include conduct that is "illegal or independently tortious."). Additionally, the application of the intra-corporate immunity doctrine relies on a factual determination of whether the Defendants were acting within the scope of their employment when they allegedly interfered with ABS' contractual relations with Hannah.

## V. *Counts XIII–XV: Tortious Interference With Business Expectancy*

ABS also alleges that the Defendants tortiously interfered with ABS's current and prospective customers, specifically, the Martin Agency and the Bank of Virginia. Defendants claim that the actions cited by ABS constitute "legitimate business competition." (Defs.' Mem. 16.) Furthermore, the underlying agreements that support these counts "have not been breached or are otherwise unenforceable." (Defs. Mem. 16.)

The elements for a cause of action for tortious interference with business expectancy are:

> (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Masco Contractor Service, Inc. v. Beals*, 279 F. Supp. 2d 699, 709, 2003 U.S. Dist. LEXIS 15013, at *20-21 (E.D. Va. 2003) (*citing Chaves v. Johnson*, 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985)).

The Court finds that the pleadings state sufficient facts to support the Plaintiff's claim for tortious interference with business expectancy. (First Am. Comp., ¶¶ 42-44.) The pleadings allege that the Plaintiffs had a business relationship with the Martin Agency and the Bank of Virginia, the Defendants were aware of this relationship, the Defendants intentionally interfered with that relationship, and the Plaintiff was damaged as a result of the Defendant's actions. (First Am. Comp., ¶¶ 125-39.) Accordingly, the Defendants Demurrer to Counts XIII-XV is overruled.

VI. *Counts XVI and XVII: Statutory and Common Law Conspiracy*

Virginia Code § 18.2-499(A) (2008) provides that it is a Class 1 misdemeanor for two or more persons to:

> combine, associate, agree, mutually undertake, or concert together for the purpose of (i) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act. . . .

To recover in an action under this statute:

> a plaintiff must prove a combination of two or more persons "for the purpose of willfully and maliciously injuring another in his reputation, trade, business, or profession . . . and resulting damage to the plaintiff."

*CaterCorp, Inc., v. Catering Concepts, Inc.*, 246 Va. 22, 28, 431 S.E.2d 277, 282 (1993); *see also Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592 (1984).

The common law, apart from the statute, recognizes a cause of action "against those who conspire to induce the breach of a contract, even when one of the alleged conspirators is a party to the contract." *Worrie v. Boze*, 198 Va. 533, 540-41, 95 S.E.2d 192, 198-99 (1956). In *Gallop v. Sharp*, 179 Va. 335, 338, 19 S.E.2d 84, 86 (1942), the Supreme Court held:

> The gist of the civil action of conspiracy is the damage caused by the acts committed in pursuance of the formed conspiracy and not the mere combination of two or more persons to accomplish an unlawful purpose or use unlawful means. In other words, the basis of the action is the wrong which is done under the conspiracy and which results in damage to the plaintiff. No cause of action exists without the resulting injury, and the damage produced must arise as the effective result of the conspiracy.

(Citations omitted.)

ABS argues that the case law only requires that the plaintiff prove legal malice, "i.e. proof that the defendant acted intentionally, purposefully, and without lawful justification." Pl.'s Mem. 17; *see also, Commercial Bus. Sys.,*

*Inc. v. BellSouth Servs., Inc.*, 249 Va. 39, 47, 453 S.E.2d 261, 267 (1995). ABS claims that it satisfied this requirement by alleging that "Defendants intentionally maliciously conspired together and have caused injury to ABS by conspiring together to fraudulently obtain the Cisco Premier Partner status." (Pl.'s Mem. 17.) Additionally, ABS argues that the corporate immunity doctrine does not apply because ABS is alleging that "TBL, Tredway, Cantwell, *and* Hannah" violated the statute. (Pl.'s Mem. 17.) Also, ABS argues it has sufficiently pleaded the requirements for common law conspiracy because it alleges the Defendants worked together to injure ABS in violation of the underlying agreements. (Pl.'s Mem. 17.)

Defendants' Demurrer to Count XVI, alleging statutory conspiracy, will be overruled because the pleadings allege that the Defendants willfully and maliciously combined to help TBL acquire its "Premier Partner" status so that it could compete with ABS's business. Thus, they have sufficiently pleaded that two or more persons combined for the purpose of willfully and maliciously injuring ABS in its business. Likewise, the Court will overrule the Defendants' Demurrer to Count XVII, alleging common law conspiracy, because the pleadings sufficiently allege an injury to ABS, which resulted from the Defendants' alleged conspiracy.

## VII. *Counts XVIII-XIX: Declaratory Judgment*

Under Virginia Code § 8.01-184 (2008), "[i]n cases of actual controversy, circuit courts within the scope of their respective jurisdictions shall have power to make binding adjudications of right." The statute is remedial and its purpose is "to afford relief from the uncertainty and insecurity attendant upon controversies over legal rights. . . ." *Reisen v. Aetna Life & Cas. Co.*, 225 Va. 327, 331, 302 S.E.2d 529, 531 (1993). The statute lists various controversies where declaratory judgment is proper, such as "Controversies involving . . . statutes, municipal ordinances, and . . . other instances of actual antagonistic assertion and denial of right." *Id.* at 331, 302 S.E.2d at 531. In other words, declaratory judgment is only proper where the controversy in question is "justiciable, that is, where specific adverse claims, based upon present rather than future or speculative facts, are ripe for judicial adjustment." *City of Fairfax v. Shanklin*, 205 Va. 227, 229, 135 S.E.2d 773, 775 (1964). However, "the declaratory judgment statute was not intended to vest [the courts] with authority to render advisory opinions, to decide moot questions, or to answer inquiries which are merely speculative." *Id.* at 229, 135 S.E.2d at 775.

In the Amended Complaint, ABS asks the Court for (i) an interpretation of the reimbursement provisions in Tredway's and Cantwell's Employee Handbook and (ii) an interpretation of the Tredway's and Cantwell's Modified Agreement and a determination of whether their original Employee Agreements should be reinstated.

The Court sustains the demurrer Counts XVIII and XIX. As the Court previously ruled herein, the language in the Employee Handbook clearly states that it is not a contract; therefore, there is no controversy as to whether its Reimbursement Agreement creates a cause of action. Additionally, a Declaratory Judgment providing an interpretation of Tredway's and Cantwell's Modified Agreements is not warranted because the non-solicitation and non-compete provisions in the Modified Agreements are not valid, and are therefore, unenforceable.

## Conclusion

The Court will sustain the Defendants' Demurrer to Counts I through IV, VI, VIII, X, XII, and XVIII through XIX. The Court overrules the Defendants' Demurrer to Counts V, VII, IX, XI, and XIII through XVII.